Jeffery J. Oven
Adam M. Olschlager
CROWLEY FLECK PLLP
490 N. 31st St., Ste. 500
P.O. Box 2529
Billings, MT  59103-2529
Telephone:  (406) 252-3441
Facsimile:   (406) 256-8526
joven@crowleyfleck.com
aolschlager@crowleyfleck.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| FIDELITY EXPLORATION & PRODUCTION COMPANY, <br><br> Plaintiff, <br><br> vs. <br><br> RYAN ZINKE, in his official capacity as Secretary of the Interior of the United States of America; JON K. RABY, in his official capacity as acting Montana / Dakotas State Director, Bureau Of Land Management; UNITED STATES DEPARTMENT OF THE INTERIOR, an agency of the United States Government; and BUREAU OF LAND MANAGEMENT, an agency of the United States Government, <br><br> Defendants. | Cause No. <br> CV-16-167-BLG-SPW-TJC <br><br><br><br> **PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

TABLE OF STATUTES & OTHER ............................................. iii-iv

I.     STATEMENT OF THE CASE ................................................1

II.    ISSUES PRESENTED ...........................................................2

     A.    Whether the BLM may "modify" an order so as to relate back in time to a prior, defective order that had been "set aside" by the Interior Board of Land Appeals for lack of jurisdiction.. .................2

     B.    Whether the BLM can enforce an order issued in clear and plain violation of the limitations periods set forth in 30 U.S.C. §§ 1713, 1724(b) ...................................................................2

     C.    Whether it was improper for the State Director to move the Approved Measurement Point upstream from the Historical Measurement Point the BLM approved in Fidelity's Badger Hill and Coal Creek Plans of Development .....................................3

III.   STANDARD OF REVIEW ......................................................3

IV.    STATEMENT OF FACTS .......................................................4

V.     ARGUMENT ..........................................................................8

     A.    The Federal Oil and Gas Royalty Simplification and Fairness Act of 1996 expressly Prohibits the Department of Interior from the type of Indefinite Tolling it seeks to apply in this case.. ...........8

     B.    The IBLA Erred in Refusing to Vacate the Modified Order ..........13

     C.    The IBLA Erred in Finding that the BLM's Approval of the PODs did not Authorize Fidelity to Commingle CBNG and make Beneficial Use of the Commingled Gas ................................17

          1.    Tongue River – Badger Hills Project ....................................17

2.    Tongue River – Coal Creek Project.......................................19

3.    The BLM Approved Commingling of Production and
Beneficial Use of CBNG when it Approved the Badger
Hills and Coal Creek PODs ...................................................21

VI.   CONCLUSION AND REQUEST FOR RELIEF ....................................25

CERTIFICATE OF COMPLIANCE....................................................................26

## TABLE OF AUTHORITIES

CASES                                                                    Page

*Brooklyn Heights Assoc. v. National Park Service,*
    818 F.Supp.2d 564 (E.D.N.Y. 2011) .................................................16

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) .........................................................................3

*CTS Corp. v. Waldburger,*
    134 S.Ct. 2175 (2014) .....................................................................10

*Doria Mining, & Eng'g Corp. v. Morton,*
    608 F.2d 1255 (9th Cir. 1979). .........................................................3

*Howard v. F.A.A.,*
    17 F.3d 1213 (9th Cir. 1994) ............................................................4

*Oregon Natural Resources Council Fund v. Brong,*
    492 F.3d 1120 (9th Cir. 2007) ..........................................................3

*School Board of Norfolk v. U.S. Gypsum Co,*
    234 Va. 32, 360 S.E.2d 325 (1987) .................................................10

*Sierra Club v. Bosworth,*
    510 F.3d 1016 (9th Cir. 2007) ..........................................................3

*Township of South Fayette v. Allegheny County Housing Authority,*
    27 F.Supp.2d 582 (W.D. Penn. 1998)) ............................................15

*U.S. v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006,*
    447 F.3d 686 (9th Cir. 2006) ...........................................................22

STATUTES/OTHER

5 U.S.C. § 701-706..............................................................................3
5 U.S.C. § 702 .....................................................................................3
5 U.S.C. § 706 ...................................................................................15

28 U.S.C. § 1331 .................................................................................3

30 U.S.C. § 1702 ............................................................................ 11-12

30 U.S.C. § 1713 ............................................................................2, 14

30 U.S.C. § 1724 .................................................................... 2, 9-15, 25

30 C.F.R. § 1202.150 ................................................................ 17, 24-25

30 C.F.R. Part 1210 ...........................................................................13

43 C.F.R. § 3162.7-3 ..........................................................................17

House Report No. 104-667 (July 11, 1996) 1996 U.S.C.C.A.N. 1442 ....................8

Senate Report No. 104-260 (May 9, 1996) 1996 WL 252622, *14 .........................9

P.L. 104-185, 110 Stat. 1700 (Aug. 13, 1996) ...........................................8

Black's Law Dictionary (9th ed. 2009) ................................................16

Merriam Webster's Collegiate Dictionary (11th ed. 2003) ....................................22

Fidelity Exploration & Production Company ("Fidelity"), through its counsel, submits this brief in support of its Motion for Partial Summary Judgment filed herewith.

I.    Statement of the Case.

This case involves the point at which coal bed natural gas ("CBNG") from federal leases should be measured for royalty purposes when produced under common plans of development approved by the Bureau of Land Management ("BLM").  In accordance with BLM-approved plans, Fidelity developed its CBNG fields as centralized units.  CBNG from each well was piped into a common central facility ("battery"), where it was individually metered (at the "inlet meters"), and then commingled for treatment, separation, and compression.  After processing, the commingled CBNG was then discharged from the battery through a "sales meter." Due to fuel consumption and treatment, volume at the sales meter would be less than the total of all gas measured at the inlet meters.

All parties recognize that the BLM can authorize an operator to commingle CBNG production and to use a proportionate part of CBNG production from federal leases for off-lease processes that benefit the federal leases.  Fidelity argues that the BLM, having approved its overall plans with full prior knowledge of how the centralized systems were designed to work, necessarily approved the operational details of the plans.

The BLM, on the other hand, argues that Fidelity did not properly seek approval of the centralized systems. Therefore, the BLM argues (for the first time and after many years of operations) that its royalty share for each federal well should be determined at the inlet meter and that Fidelity must produce voluminous records in that regard never before requested.

This appeal also presses the question of whether the BLM can issue an order that is undisputedly beyond its jurisdiction, have that order "set aside" by the Interior Board of Land Appeals ("IBLA"), and then "modify" that order so as to address the jurisdictional defect – but yet relate back in time to the original order. Fidelity argues that the BLM cannot give retroactive effect to a defective administrative order, and that its attempt to do so constitutes a plain and clear violation of the limitations periods set out in 30 U.S.C. §§ 1713, 1724(b). Having argued a narrow interpretation of the PODs, the BLM nonetheless abruptly adopts a liberal interpretation of the limitations period in 30 U.S.C. § 1724(b), apparently asserting a type of tolling that does not exist.

II.   <u>Issues Presented</u>.

    A. Whether the BLM may "modify" an order so as to relate back in time to a prior, defective order that had been "set aside" by the Interior Board of Land Appeals for lack of jurisdiction.

    B. Whether the BLM can enforce an order issued in clear and plain violation of the limitations periods set forth in 30 U.S.C. §§ 1713, 1724(b).

C. Whether it was improper for the State Director to move the Approved Measurement Point upstream from the Historical Measurement Point the BLM approved in Fidelity's Badger Hill and Coal Creek Plans of Development.

III.   Standard of Review.

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, governs judicial review of final agency actions. 5 U.S.C. § 702.  This court has jurisdiction to review administrative decisions of the Secretary of the Interior under 28 U.S.C. § 1331(a).  *Doria Mining, & Eng'g Corp. v. Morton*, 608 F.2d 1255, 1257 (9th Cir. 1979).  An IBLA ruling represents a final agency action of the Secretary of the Interior. *Id.*  Therefore, this court has jurisdiction to review a decision issued by the IBLA. *Id.*

In reviewing decisions by the IBLA, the court must "set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or if [it] failed to meet statutory, procedural, or constitutional requirements." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971).  Under the arbitrary and capricious standard, the court must "engage in a substantial inquiry" and perform a "thorough, probing, in-depth review." *Oregon Natural Resources Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007).  "The agency must articulate a rational connection between the facts found and the conclusions reached." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1023 (9th Cir. 2007).

3

Questions of law are reviewed under the *de novo* standard of review. *Howard v. F.A.A.*, 17 F.3d 1213, 1215 (9th Cir. 1994).

IV.   <u>Statement of Facts</u>.

In 1999, Fidelity began a coal bed natural gas ("CBNG") development in Big Horn County, Montana, called the Tongue River Project. Plaintiff's Statement of Undisputed Facts ("SUF"), ¶ 1. As part of this project, Fidelity submitted Plans of Development ("PODs") to the BLM for development of the Badger Hills and Coal Creek areas. SUF, ¶ 2. Each of the proposed PODs included a mix of federal, state and private lands. SUF, ¶ 3.

One of the primary concerns in developing the PODs was minimizing the potential environmental impact of the CBNG operations, particularly with regard to the disruption of sage grouse. SUF, ¶ 5. Accordingly, the PODs were intentionally designed to utilize centralized batteries to reduce surface disturbance. SUF, ¶ 6. By design, and as a condition of approval, initial treatment, separation, compression and metering of the CBNG would occur not on the various leases, but at centralized batteries where gas from federal, state, and fee leases would be combined, metered and processed. *Id*. The sharing of centralized facilities was also key to the economics of the projects. SUF, ¶ 7. Development without approval for commingling and beneficial use of the gas would not have been economical to Fidelity. SUF, ¶ 8.

4

After months of consultation between Fidelity and the BLM, the Badger Hills POD was approved on February 9, 2004, and the Coal Creek POD was approved on January 19, 2005. SUF, ¶ 4.  Fidelity developed the Badger Hills and Coal Creek areas as provided in the approved PODs, each month reporting gas sales and royalties to the Office of Natural Resources Revenue ("ONRR").  It was until years later that either agency raised any concern with regard to Fidelity's production reporting. SUF, ¶ 9.

In 2011 and 2012, the BLM Miles City Field Office ("MCFO") conducted "Production Accountability Inspections" of Fidelity's CBNG wells. SUF, ¶ 13.  At that time, the correct procedures for the BLM to follow in such inspections were plainly laid out in IM 2009-174.[1] SUF, ¶ 14.  In the event the BLM believed there to be a production reporting error, it was required to work with the operator on any discrepancy, but it was not allowed to order the creation of new production reports. *Id*.  Ultimately, if an Order concerning production data needed to be issued, that was strictly within the jurisdiction of the MMS (now ONRR), the government agency tasked with revenue collection under federal oil and gas leases.  *Id*.  Rather than follow these simple procedures, on October 25, 2012, the Assistant Field Manager of the MCFO issued an admittedly unlawful Order (the "MCFO Order") directing

---

[1] Bureau of Land Management, *Request for Modified or Missing Oil and Gas Operations Report from the Minerals Management Service*, July 10, 2009, *available at* https://www.blm.gov/policy/im-2009-174.

Fidelity to change the way it reported CBNG production to the ONRR. SUF, ¶ 15.

The unlawful MCFO Order specified the following corrective actions:

> Fidelity shall report all gas volumes from the individual well meters. Fidelity shall submit amended reports to the Office of Natural Resources Revenue (ONRR) using the volumes from the individual well meters going back six (6) years from receipt of this letter for all cases on the attached list.  Fidelity shall also submit all future reports following this corrective action for all cases on the attached list.
>
> ***
>
> On all gas that is being used downstream of the FMP and lease boundary, Fidelity shall discontinue reporting the "used on lease" on the OGOR forms for the Federal CBNG production in Montana. Fidelity shall submit amended reports to the Office of Natural Resources Revenue (ONRR) eliminating the unauthorized 'used on lease' deductions by going back six (6) years from receipt of this letter for all cases on the attached list.  Fidelity shall also submit all future reports following this corrective action for all cases on the attached list.

SUF, ¶ 16.

In essence, the MCFO Order required Fidelity to report CBNG production on an individual well basis, as if the PODs had never been approved. *Id.* Fidelity requested a review by the State Director. SUF, ¶ 20.  The State Director affirmed the MCFO Order in a letter decision issued March 7, 2014. SUF, ¶ 21.

However, on appeal to the Interior Board of Land Appeals ("IBLA"), the BLM requested a remand of its own Order on the grounds that it lacked authority to order Fidelity to amend its OGORs. SUF, ¶ 22.  As a result, by Order dated April 24, 2014,

the IBLA set aside the decision and remanded the case. SUF, ¶ 23.  The IBLA's

Order stated in full:

> Counsel for the Bureau of Land Management (BLM) has requested that the Board remand the above-captioned appeal.  BLM has concluded that, in the decision on State Director Review under appeal here, the BLM Montana State Director erroneously affirmed a field office decision.  The request is granted.
>
> Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, the <u>decision</u> is <u>set aside</u> and the <u>case</u> is remanded to BLM.

SUF, ¶ 24 (emphasis added).

On remand, the State Director again elected to ignore proper procedures (now

specified in IM 2013-041).  In a letter decision creatively captioned "Affirmed as

Modified" dated June 16, 2014 (the "Modified Order"), the State Director simply

removed the requirement that Fidelity submit amended OGORs <u>to the</u> <u>ONRR</u>, and

replaced it with the requirement that Fidelity submit the same information <u>to the</u>

<u>MCFO</u>, and added the words "for verification." SUF, ¶ 25. Even more egregiously,

although the Modified Order was issued on June 16, 2014, it retained the

requirement that Fidelity amend its reporting going back six years prior to its receipt

of the October 25, 2012 MCFO Order. SUF, ¶ 26.  <u>The result being that Fidelity was</u>

<u>ordered to change its reporting going back nearly 8 years</u>.

On September 16, 2016, the IBLA affirmed the State Director's June 16, 2014

Order. SUF, ¶ 28.  Fidelity timely filed this current appeal.

V.   <u>Argument</u>.

When the BLM approved the Badger Hills and Coal Creek PODs with full knowledge of the design of the central facilities, it necessarily approved the component parts of those PODs, including commingling of production prior to measurement and off-lease beneficial use.  The IBLA Decision should be reversed and vacated on these grounds alone.  However, actions of the Department of the Interior went from wrong to egregious when the State Director purported to "modify" an invalid order for the purpose of defeating the applicable statutes of limitation.

   A.   <u>The Federal Oil and Gas Royalty Simplification and Fairness Act of 1996 expressly Prohibits the Department of Interior from the type of Indefinite Tolling it seeks to apply in this case</u>.

A primary driving force behind the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996[2] (the "Royalty Fairness Act") was a widespread perception that the Department of the Interior's administration of federal leases had become unduly burdensome and unfair.  As stated by the House Resources Committee, "the federal royalty program is overly complex, burdensome and unfair for oil and gas exploration and development companies" seeking to do business with the Department of the Interior…."[3]  This situation resulted in

---

[2] P.L. 104-185, 110 Stat. 1700 (Aug. 13, 1996), codified at 30 U.S.C. §§ 1701, 1702, 1721a, 1724 - 1726, 1732, and 1735.
[3] Federal Oil and Gas Royalty Simplification and Fairness Act of 1996:  Dates of Consideration and Passage, House Report No. 104-667 (July 11, 1996) (hereinafter "House Report No. 104-667"), 1996 U.S.C.C.A.N. 1442, 1443.

8

diminished competition for federal leases.  *Id*.  The Royalty Fairness Act was intended to alleviate the unreasonable burdens and inequities imposed on lessees by Department of the Interior regulations, policies and procedures promulgated under the federal leasing laws.  *See id.*

Chief among the inequities was the uncertainty and unfairness imposed on lessees by indefinite and/or limitless royalty audits.  As recognized by the House Resources Committee, "The burden of never being free of audit exposure by the Federal Government is grossly unfair as well as the antithesis of simplicity."  *Id*. The protracted federal royalty audit process was made worse by the fact that interest would continue to accrue on any royalty amount ultimately determined to be due, and the lessee would be required to maintain its production records, both of which could be very costly.[4]

In the Royalty Fairness Act, Congress deliberately placed an absolute end to the Department of the Interior's burdensome and unfair policy of subjecting federal lessees to unending audit exposure.  This was accomplished through enactment of a "limitation period," now codified at 30 U.S.C. § 1724(b), which states:

> A judicial proceeding or demand which arises from, or relates to an obligation, shall be commenced within seven years from the date on which the obligation becomes due and if not so commenced shall be barred.  If commencement of a judicial proceeding or demand for an obligation is barred by this section, the Secretary...(A) shall not take any other or

---

[4] Federal Oil and Gas Royalty Simplification and Fairness Act of 1996; Federal Oil and Gas Royalty Simplification and Fairness Act of 1995:  Dates of Consideration and Passage, Senate Report No. 104-260 (May 9, 1996) (hereinafter "Senate Report No. 104-260"), 1996 WL 252622, *14.

further action regarding that obligation, including (but not limited to) the issuance of any order, request, demand or other communication seeking any document, accounting, determination, calculation, recalculation, payment, principal, interest, assessment, or penalty or the initiation, pursuit or completion of an audit with respect to that obligation; and shall not pursue any other equitable or legal remedy, whether under statute or common law, with respect to an action on or an enforcement of said obligation; and (B) shall not pursue any other equitable or legal remedy, whether under statute or common law, with respect to an action on or an enforcement of said obligation.

30 U.S.C. § 1724(b) (emphasis added).

The "limitation period" created by 30 U.S.C. § 1724(b) is in the nature of a statute of repose. It places an outer limit on the time in which the federal government can commence a judicial proceeding or "demand" with regard to an obligation (*i.e.* to pay royalty). The time limitation is an absolute bar, measured not from the accrual of a claim, but on a specified event – the "date on which the obligation becomes due." As such, the statute reflects a legislative decision that, as a matter of policy, there should be a specific time beyond which a defendant should no longer be subject to protracted liability. *See CTS Corp. v. Waldburger*, 134 S.Ct. 2175, 2183 (2014) (*quoting School Board of Norfolk v. U.S. Gypsum Co.*, 234 Va. 32, 37, 360 S.E.2d 325, 328 (1987).

However, 30 U.S.C. § 1724(b) is more than just a statute of repose. It is also a plain and clear directive to federal agencies: if a judicial action or administrative demand is not timely commenced with regard to a royalty obligation, not only are such actions forever barred, but the Department of the Interior is also barred from

10

taking "any other or further action" regarding that royalty demand.  30 U.S.C. § 1724(b).  This specifically includes the issuance of any order, request, demand or communication for any document, accounting, calculation, recalculation, or the initiation, pursuit or completion of an audit.  *Id.*  As reflected in the legislative history of the Royalty Fairness Act, the statutory bar against further administrative action is no accident of the legislative process.  Rather, it reflects a deliberate legislative determination – based on prior experience – that after seven years, it is no longer fair to allow federal agencies to continue to pursue stale claims against federal lessees – and in fact, that such practices harm the federal leasing program.

The "obligation" at issue in this case is any potential duty that Fidelity may have to pay additional royalties that may be claimed by the Department of Interior against its CBNG wells during the time period specified in the Modified MCFO Order.  *See* 30 U.S.C. § 1702 (25).  A "demand" is defined in the Royalty Fairness Act as "an order to pay issued by the Secretary…that has a reasonable basis to conclude that the obligation in the amount of the demand is due and owing…."  30 U.S.C. § 1702 (23).  An "order to pay" is specifically defined as "a written order issued by the Secretary…to a lessee…which:  (A) asserts a specific, definite, and quantified obligation claimed to be due, and (B) specifically identifies the obligation by lease, production month and monetary amount of such obligation claimed to be due and ordered to be paid, as well as the reason or reasons such obligation is claimed

to be due, <u>but such term does not include any other communication or action by or on behalf of the Secretary</u>...."  30 U.S.C. § 1702(2) (emphasis added).

No demand has issued in this case.  This fact is beyond dispute.  As specified in the Royalty Fairness Act, a "demand" must:  (1) be an order to pay; (2) in writing; (3) issued by the Secretary; (4) asserting a specific, definite, quantified monetary obligation; (5) specifically identifying the obligation by lease, production month and monetary amount; (6) stating the reason the obligation is due; and (7) having a reasonable basis to conclude the obligation in the amount of the demand is due and owing.  *See* 30 U.S.C. § 1702(23), (26).  Fidelity has received nothing of the sort.

Because no demand has issued, the limitation period prescribed in 30 U.S.C. § 1724(b) flatly prohibits the Department of the Interior from taking <u>any</u> <u>further action</u> against Fidelity for any royalty obligation due more than seven years ago. This, as discussed further below, includes the Department's current thinly-disguised efforts to audit Fidelity all the way back to October, 2006.[5]  Even if ONRR issued a proper demand as of the date this brief was filed, the limitation period would bar any administrative action with regard to any royalty obligation due before the last day of February, 2011.[6]  Thus, the State Director's June 16, 2014 Modified Order seeks to

---

[5] The State Director's June 16, 2014 Modified Order requires Fidelity to recalculate and re-report its production going back six years from Fidelity's receipt of the MCFO dated October 25, 2012.
[6] Pursuant to 30 U.S.C. § 1724(c), a royalty obligation becomes due for any given production month on the last day of the calendar month following the month in which oil or gas is produced.

go back five years beyond the time barred under 30 U.S.C. § 1724(b). The Modified Order is contrary to 30 U.S.C. § 1724(b) and, for this reason alone, must be vacated.

B. The IBLA Erred in Refusing to Vacate the Modified Order.

After the IBLA "set aside" the State Director's June 16, 2014 decision for lack of jurisdiction and remanded the case, the BLM could have followed the procedures set forth in IM 2103-041. It could have asked the ONRR to issue an Order to Report. Instead, the BLM ordered Fidelity to report the very same information to the MCFO "for verification."

The Modified Order is unusual. The BLM does not ordinarily collect the type of information requested – under the regulations, this information is to be reported to ONRR. *See* 30 C.F.R. Part 1210 ("Forms and Reports"), Subparts A-C (2016). It is therefore unclear what the requested information would be "verified" against. The Modified Order is silent in this regard. The undersigned attorneys are not aware of any regulations providing for this procedure. Nor could the purpose be related to "verifying" Fidelity's measurements. The BLM has admitted that it previously witnessed the calibration of these very meters, and inspected them for compliance with federal regulations. SUF, ¶ 17. So why did the BLM fabricate this strange new procedure?

The answer lies in the limitations period set out in the Royalty Fairness Act. If the BLM were to start over using proper procedures, the limitations period

prescribed in the Royalty Fairness Act would preclude the BLM / ONRR from taking <u>any</u> action dating back more than seven years from the time a proper demand was made. (Likewise, 30 U.S.C. § 1713 imposes a six-year limitation on a lessee's obligation to maintain and produce records.) Therefore, instead of following the prescribed procedure, the BLM simply ordered Fidelity to report the very same information to the BLM "for verification." Once BLM had this information, it would pass it on to the ONRR, which would order Fidelity to pay royalties on the higher volumes. In this manner, the BLM and ONRR would combine to accomplish what neither agency could lawfully do on its own.

Such intent is apparent in footnote 1 to the BLM's "Response to Petition for Stay" filed with the IBLA on or about July 24, 2014. The footnote states:

> BLM and the Office of Natural Resources Revenue are hereby reserving the <u>right to argue</u> that the October 25, 2012 Order required Fidelity to produce records for the six years prior to October 25, 2012, which <u>tolled the six year period provided by 30 U.S.C. § 1713</u>, and constitutes a <u>demand for royalties which tolled the statute of limitations in 30 U.S.C. § 1724(b)(1)</u>.

SUF, ¶ 27 (emphasis added).

The BLM's chosen approach is absurd and is a plain attempt to expand its authority beyond that allowed by law. The October 25, 2012 MCFO Order clearly does not meet the statutory definition of "demand" set out in the Royalty Fairness Act (and discussed in Section V.A.1. above). It is not an "order to pay" at all, let alone does it assert a specific, definite, quantified monetary obligation. The fact that

14

no demand issued has already been twice determined in this case.  SUF, ¶ 19.  The Royalty Fairness Act specifically precludes the type of tolling argued by the BLM.  *See* 30 U.S.C. § 1724(d).  The actions of the BLM and ONRR in this matter constitute precisely the type of behavior the Royalty Fairness Act was intended to stop.

The fact is, in the absence of a timely "demand," the Royalty Fairness Act bars "any other or further action" by the Secretary with regard to any time-barred obligation.  30 U.S.C. § 1724(b).  This includes "any communication seeking any document." *Id*.  The statute even goes so far as to bar the Secretary from the "pursuit or completion" of an ongoing audit. *Id.*  Clearly, as set forth above, the BLM's Modified Order represents an ongoing action regarding a (purported) time-barred obligation.  It is therefore contrary to law, and the IBLA erred in not so holding.

The IBLA also erred in not vacating the Modified Order on jurisdictional grounds.  In its request for remand, the BLM admitted that it did not have authority to issue the MCFO Order.  *See* Request to Remand Matter Back to the Bureau of Land Management, IBLA 2014-156 (April 18, 2014).  The MCFO Order and the State Director's March 7, 2014 decision affirming that order are therefore null and void. 5 U.S.C. § 706(2)(C); *Township of South Fayette v. Allegheny County Housing Authority*, 27 F.Supp.2d 582, 595 (W.D. Penn. 1998) ("actions which are not undertaken in accordance with the law are null and void").  It was plain error for the

State Director to issue the Modified Order purporting to relate back to the invalid MCFO Order, and IBLA should have so held. *See Brooklyn Heights Assoc. v. National Park Service*, 818 F.Supp.2d 564, 568 (E.D.N.Y. 2011) ("If a court determines that an agency action violated the APA standard, the proper course is for the action, finding, and conclusions to be vacated, then remanded to the agency for further administrative proceedings consistent with the court's opinion.") (emphasis added).

Based on the BLM's admission that it was without authority to issue the MCFO Order, the IBLA "set aside" the State Director's March 7, 2014 decision affirming the MCFO Order.  SUF, ¶ 24.  The phrase "set aside" means to "annul or vacate" a judgment or order.  Black's Law Dictionary (9th ed. 2009).  Yet, inexplicably, the IBLA later held that the MCFO Order could somehow be resurrected in another form but with the same effective date. SUF, ¶ 28.  This is nonsense.  Citizens should be able to rely on the plain language of an order.

In summary, the MCFO Order was null, void, and unenforceable for lack of jurisdiction.  Having no legal force or effect, it cannot form the basis for a subsequent "modified" order, allowing the BLM to indefinitely suspend the limitations periods. The null and void MCFO Order was "set aside" by the IBLA.  The only lawful and reasonable interpretation of the IBLA's order of remand is that the null and void MCFO Order was vacated by the IBLA.

C. The IBLA Erred in Finding that the BLM's Approval of the PODs did not Authorize Fidelity to Commingle CBNG and make Beneficial Use of the Commingled Gas.

A federal lessee may commingle federal production from other sources prior to measurement with approval of the BLM.  43 C.F.R. § 3162.7-3.  While there is no question that a federal lessee may make beneficial use of CBNG production for purposes such as plant fuel when the facility is located on the leased lands, the Department of the Interior has taken the position that the BLM must first authorize such use with regard to facilities located off of the leased lands pursuant to 30 C.F.R. § 1202.150 (2016).

Neither regulation requires any particular form of request or approval.  Nor is there anything in the regulations that prohibits the BLM from approving commingling and off-lease beneficial use as part of the approval of a POD.  Fidelity contends that in approving the Badger Hills and Coal Creek PODs with full knowledge of the design of the central facilities, the BLM necessarily approved the component parts of those PODs, including commingling of production prior to measurement and off-lease beneficial use.  This interpretation is supported by examination of the approved PODs as a whole.  The paragraphs below set forth relevant passages from the PODs evidencing this approval.

1. Tongue River – Badger Hills Project.

Under "Proposed Facilities and Operations," the Project Description states:

> Fidelity will drill up to five wells at each location, completing the wells in one or more Fort Union coals on federal, fee and state mineral leases in the CX Field in Township 9 South, Range 40 East…
>
> <u>Federal lease wells will be managed and operated in conjunction with adjacent/nearby fee lease wells, sharing facilities constructed and operating on the leases.</u>  Associated facilities include access roads (graveled), access routes (two tracks), pipelines for gathering gas and produced water, produced water storage impoundments and discharge points, electrical utilities, <u>central gas gathering, metering and gas/water separation facilities (batteries).</u>  At each battery, CBNG is compressed and treated for transport via intermediate pressure gas pipelines to a high pressure transmission pipeline.

SUF, ¶ 11(a) (emphasis added).

The Master Surface Use Plan states that the Tongue River-Badger Hills Project will "include drilling, completing and producing 178 wells (86 federal wells, 72 fee wells, and 20 State of Montana wells) in up to five Fort Union coals on U.S. Bureau of Land Management (BLM), fee, and Montana state leases." SUF, ¶ 11(c). The Master Surface Use Plan goes on to state that the "<u>federal lease wells would be managed and operated in conjunction with adjacent/nearby fee and state wells, sharing facilities constructed and operating on the leases.</u>" *Id.* (emphasis added).

Under paragraph 1 of Well Field Construction, the Master Surface Use Plan states, in relevant part, as follows: (i) "The Consol 27 Battery is CDP [Central Delivery Point] for 48 wells, <u>including 16 Federal wells and 32 fee wells</u>"; (ii) "The 7 Brothers Battery is CDP for 50 wells, <u>including 15 Federal and 35 fee wells</u>"; and

(iii) "The Montana State 36 Battery is CDP for 35 wells, <u>including 15 Federal and 20 state wells</u>." SUF, ¶ 11(e) (emphasis added).

Under paragraph 4 of Well Field Construction, the Master Surface Use Plan states that "Facilities will be constructed on fee and Montana state surfaces within the project area, to support CBNG production <u>from underlying and other nearby mineral leases</u>." SUF, ¶ 11(g) (emphasis added). Furthermore, under the heading "Gas Metering/Compression Installation and Operations/ Maintenance" of paragraph 4, the Master Surface Use Plan states as follows:

> <u>Metering of natural gas flow from each well, treatment of the gas stream for additional water separation, and initial compression of the treated gas would occur at the battery.</u>  Each battery would serve about 40 to 60 wells.

SUF, ¶ 11(h) (emphasis added); *see also* Wildlife Monitoring Plan at SUF, ¶ 11(j) ("Structures associated with the project (compressors, metering, buildings, holding tanks, generators, and storage facilities, etc.) will be located outside of the respective impact zones of important wildlife habitats.").

　　　　2.　<u>Tongue River – Coal Creek Project</u>.

Under "Proposed Facilities and Operations," the Project Description states:

> For the Coal Creek Project, Fidelity will drill and complete CBNG wells in up to five Fort Union coals on BLM, fee and state mineral leases…
>
> <u>Federal lease wells, described in this POD, would be managed and operated in conjunction with adjacent/nearby fee and state lease wells in the project, sharing facilities constructed and operating on the leases.</u>

> Associated facilities include access roads (graveled), access routes (two-tracks), pipelines for gathering gas and produced water, produced water storage impoundments and discharge points, electrical utilities, <u>central gas gathering, metering and gas/water separation facilities or "batteries"</u>.  At each battery, coal bed natural gas (CBNG) is compressed and treated for transport via intermediate pressure gas pipelines to a high pressure transmission pipeline by Bitter Creek….

SUF, ¶ 11(b) (emphasis added).

The Master Surface Use Plan states that the Tongue River-Coal Creek Project will "encompass federal, state and private surfaces…and will include drilling and completing 210 wells (<u>132 federal, 16 states and 62 fee</u>) in up to five Fort Union Coals."  SUF, ¶ 11(d) (emphasis added). The Master Surface Use Plan goes on to state:  "<u>Federal lease wells will be operated with adjacent/nearby state and fee lease wells, sharing facilities constructed and operating on the leases</u>."  *Id.* (emphasis added).

Under paragraph 1 of Well Field Construction, the Master Surface Use Plan states, in relevant part, as follows:

> (i) "Montana State 36 is an existing battery <u>currently serving 15 federal and 20 fee wells</u>.  It will be in the <u>central delivery point (CDP)</u> for 5 federal wells"; "Rancholme 21 battery is the proposed CDP for <u>25 federal wells and 16 state wells</u>"; "Rancholme 28 battery is the proposed CDP for <u>58 federal wells and 15 fee wells</u>"; "Rancholme 29 battery is the proposed CDP for <u>29 federal wells and 24 fee wells</u>"; and "Visborg 25 is an existing battery currently serving 40 federal wells.  It will be the CDP for <u>15 federal wells and 23 fee wells</u>."

SUF, ¶ 11(f) (emphasis added).

Under paragraph 4 of Well Field Construction, the Master Surface Use Plan states that "Facilities will be constructed on federal, state and fee surfaces to support CBNG production from underlying and nearby mineral leases."   SUF, ¶ 11(g) (emphasis added).   Furthermore, under the heading "Gas Metering, Gas/Water Separation and Compression Installation and Operations/Maintenance" of paragraph 4, the Master Surface Use Plan states as follows:

> Metering of natural gas flow from each well, additional gas/water separation, and initial compression of gas will occur at the battery.

SUF, ¶ 11(i) (emphasis added).

When the provisions of the Badger Hills and Coal Creek PODs are read and construed as whole, integrated documents, the parties' intent is clear.  The PODs were designed to utilize centralized batteries to provide the most economical system to produce CBNG with the least environmental impact, and the only way to accomplish that goal is to combine gas from Federal leases with gas from other leases at centralized batteries.[7]   Fidelity's PODs clearly reflect that the initial treatment, separation, compression and metering would occur at centralized batteries, where gas from federal, state, and fee wells would be combined, processed and managed as a common stream.

3. The BLM Approved Commingling of Production and Beneficial Use of CBNG when it Approved the Badger Hills and Coal Creek PODs.

---

[7] In the absence of centralized batteries, countless miles of roads to hundreds of individual wells would have had to been constructed in order to develop the Badger Hills and Coal Creek areas.

21

Although the approved PODs do not contain the word "commingle," both include the phrase "managed and operated in conjunction with." This phrase, read in the overall context of the approved PODs, carries the same meaning as commingle. The word "commingle" is not defined in the statutes or regulations. However, words are given their ordinary or natural meaning. *See U.S. v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 689 (9th Cir. 2006). When a word is not defined, it is common practice to consult dictionary definitions to clarify a word's ordinary meaning. *See id.* The word "commingle" is ordinarily or naturally defined to mean "to blend thoroughly into a harmonious whole" or "to combine (funds or properties) into a common fund or stock". See Merriam Webster's Collegiate Dictionary, 249 (11th ed. 2003). The word "conjunction" is ordinarily or naturally defined to mean the act of "conjoining" (or "to join together for a common purpose"). See Merriam Webster's Collegiate Dictionary, 263. Based on the ordinary meanings, the words "conjunction" and "commingle" clearly mean the same thing – that two or more things are combined or joined together.

The PODs set forth the Federal leases would be managed and operated in conjunction with other leases, and that all such leases would share facilities. In addition, the PODs set forth that metering and various treatment and compression of the combined gas would occur at the centralized batteries that would serve federal,

state, and fee wells.  The PODs clearly reflect that federal, state and fee leases would be operated together, using common facilities.  It is improper and unreasonable to interpret the language "managed and operated in conjunction with," construed in its overall context with the other language of the PODs, to mean that Federal and other leases would be operated in any way other than combining (commingling) the gas from all such leases.  Moreover, it was the parties' intent that Fidelity would commingle such gas.  In fact, Fidelity operated under that agreement since the PODs were approved in the late 1990s and early 2000s and without question (until recently) from the BLM.

The Modified Order purports to confirm Fidelity's approval for off-lease measurement.  However, by "moving" the off-lease measurement point upstream to the intake of the centralized battery, the BLM has effectively eliminated the purpose and intent of such off-lease measurement and reversed Fidelity's approved course of action pursuant to the PODs.

Although the BLM now maintains that off-lease measurement and commingling must be individually approved, the regulations contain no such requirement.  In fact, it stands to reason commingling would often be approved at

the same time as approval for off-lease measurement.  That is exactly what happened in this case.[8]

Unless modified by the applicable lease, gas used off-lease for the benefit of the lease is allowed as a deduction.  See, e.g., 30 C.F.R. § 1202.150(b).  The royalty regulation states, in relevant part, as follows:

> (b)(1)  All gas (except gas unavoidably lost or used on, or for the benefit of, the lease, including that gas used off-lease for the benefit of the lease when such off-lease use is permitted by the BSEE or BLM, as appropriate) produced from a Federal lease to which this subpart applies is subject to royalty.
>
> (2)  When gas is used on, or for the benefit of, the lease at a production facility handling production from more than one lease with the approval of BSEE or BLM, as appropriate, or at a production facility handling unitized or communitized production, only that proportionate share of each lease's production (actual or allocated) necessary to operate the production facility may be used royalty free.
> ….

See 30 C.F.R. § 1202.150 (2016).

Subsection (b)(1) of the regulation excepts gas "used on, or for the benefit of, the lease" from the royalty obligation, "including" gas used when permitted by the BLM.  The word "including" is one of inclusion and cannot be read as a limitation on the prior clause.  There is no question that the gas used in this case was used for the benefit of the federal leases.  Regardless, as reflected in the discussion above,

---

[8] The CBMG having been commingled and processed, it logically follows that the BTU content should be sampled and measured from the commingled stream, *i.e.* at the sales meter, as Fidelity has done.

BLM approval of the centralized design of the Badger Hills and Cedar Creek PODs included approval of beneficial use of the gas at the centralized batteries. The gas that was used on or for the benefit of the lease can therefore be deducted in the instant case under 30 C.F.R. § 1202.150.

VI.   Conclusions and Request for Relief.

The IBLA erroneously affirmed the BLM State Director's June 16, 2014 Modified Order, which purports to modify the unlawful MCFO Order. Accordingly, Fidelity respectfully requests this court to:

(1) issue a declaratory ruling holding invalid the BLM State Director's June 16, 2014 Modified Order, on the grounds that it is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and contrary to law;

(2) set aside and vacate the IBLA Decision as arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and contrary to law;

(3) declare that the Department of the Interior's actions in this case violate 30 U.S.C. 1724(b) by requiring Fidelity to amend its production reports more than seven years back; and

(4) enjoin the Bureau of Land Management and Office of Natural Resources Revenue from taking any further action with regard to the State Director's June 16, 2014 Modified Order.

DATED this 13th day of March, 2018.

CROWLEY FLECK PLLP

By:     /s/ Jeffery J. Oven
        JEFFERY J. OVEN
        ADAM M. OLSCHLAGER
        P.O. Box 2529
        Billings, MT  59103-2529
        Ph: (406) 252-3441
        *Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(d)(2) of the United States Local Rules, I certify that this Brief is limited to 6338 words, excluding caption and certificates of service and compliance, printed in at least 14 points and is double spaced, except for footnotes and indented quotations.

/s/ Jeffery J. Oven
Crowley Fleck PLLP
PO Box 2529
Billings, MT  59103-2529

26